ROBERT S. BREWER, JR.
United States Attorney
DAVID J. RAWLS
Assistant U.S. Attorney
District of Columbia Bar No. 974620
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-7966
Email: david.rawls@usdoj.gov

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. **'19CV2171 BEN MDD** |
| Plaintiff, | **COMPLAINT FOR FORFEITURE** |
| v. | |
| $269,952.56 FROM WELLS FARGO BANK ACCOUNT NUMBER ##0293; | |
| $536,422.59 FROM WELLS FARGO BANK ACCOUNT NUMBER ##0285; | |
| REAL PROPERTY LOCATED AT 5043 BLUFF, PL, EL CAJON, CA 92020; | |
| Defendants. | |

By way of complaint against the Defendants, $269,952.56 seized from Wells Fargo Bank account number ending in ##0293; $536,422.59 seized from Wells Fargo Bank account number ending in ##0285; and Real Property located at 5043 Bluff Place, El Cajon, California 92020, Plaintiff, UNITED STATES OF AMERICA alleges:

## I.   NATURE OF THE ACTION

1.    This is a civil action in *rem* brought against the Defendants to enforce the provisions of Title 18, United States Code, Section 981(a)(1)(C), because the Defendants are subject to forfeiture as any property, real or personal, which constitutes or are derived, from proceeds traceable to violations of Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire/Mail Fraud and Health Care Fraud); and Title 18,

United States Code, Section 1347 (Health Care Fraud); and Title 42, United States Code, Section 1320-7b(b)(2)(A) (Anti-Kickback Statute); and Title 18, United States Code, Section 1956 (Laundering Monetary Instruments); and Title 18, United States Code, Section 1957 (Transacting in Criminal Proceeds); or any violation of any offense constituting a "specified unlawful activity" as defined in Title 18, United States Code, Section 1956(c)(7), or a conspiracy to commit such offense.

2.     The Defendants are also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A) as any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or Title 18, United States Code, Section 1957.

3.     Title 18, United States Code, Section 981(a)(2)(A) defines "proceeds" for cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit limited realized from the offense."

## II.   <u>JURISDICTION AND VENUE</u>

4.     This Court has original jurisdiction of this civil action under Title 28, United States Code, Section 1345 because it has been commenced by the United States, and under Title 28, United States Code, Section 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

5.     Venue is proper pursuant to Title 28, United States Code, Section 1355(b) because acts and omissions giving rise to this forfeiture action occurred in the Southern District of California, and under Title 28, United States Code, Section 1395 because the property was found and is located in this district.

## III.   <u>PARTIES</u>

6.     Plaintiff is the United States of America.

7.     Defendant is $269,952.56 in U.S. currency seized from Wells Fargo Bank account number ending in ##0293 on May 15, 2019 pursuant to a seizure warrant signed

by the Honorable Michael S. Berg. Wells Fargo Bank account number ##0293 was registered to Universal Medical Solutions, LLC. The signers on the account were Anthony Duane Bell, Sr. and Anthony Duane Bell, Jr.

8.      Defendant is $536,422.59 in U.S. currency seized from Wells Fargo Bank account number ending in ##0285 on April 8, 2019 pursuant to a seizure warrant signed by the Honorable Andrew G. Schopler. Wells Fargo Bank account number ##0285 was registered to Universal Medical Solutions, LLC. The signers on the account were Anthony Duane Bell, Sr. and Anthony Duane Bell, Jr.

9.      Defendant is Real Property located at 5043 Bluff Place, El Cajon, California 92020.  The Real Property is owned by Anthony Duane Bell, Sr. and Tamara Sherra Bell, as joint tenants in common. The Real Property is more fully described in paragraph 108 below.

## IV.    RELEVANT PARTIES

10.      Anthony Duane Bell, SR. (BELL SR.) was the co-owner of Universal Medical Solutions, LLC.

11.      Anthony Duane Bell, Jr. (BELL JR.) was the co-owner of Universal Medical Solutions, LLC. BELL JR. is the son of BELL SR.

12.      Universal Medical Solutions, LLC was a company that sold durable medical equipment (DME) and submitted claims to Medicare for reimbursement. Universal Medical Solutions has two physical locations in San Diego County—Universal Medical Solutions 1 and Universal Medical Solutions 2. According to California Secretary of State records and Medicare enrollment forms, Universal Medical Solutions, LLC was owned by BELL JR. and co-operated by BELL SR. and BELL JR.

13.      CHS-1 was the owner of two call center companies, Chronos Strategies HLK ("Chronos") and Pantheon Concepts HLK ("Pantheon). Chronos and Pantheon were located in the Philippines.[1]

---

[1]      During CHS-1's period of cooperation with the government, CHS-1 was permitted to continue operating, which enabled CHS-1 to receive proceeds of hundreds

## V.   **OVERVIEW OF THE MEDICARE FRAUD SCHEME**

14.   From on or about March 26, 2017 through April 9, 2019, BELL SR. and BELL JR., through their DME company Universal Medical Solutions, LLC, conspired with CHS-1, and CHS-1's call center companies, Chronos and Pantheon, and others, to defraud Medicare. BELL SR. and BELL JR. paid illegal kickback fees to CHS-1, in exchange for CHS-1 providing customers that are Medicare beneficiaries *along with* signed "completed doctors' orders" for medically unnecessary DME. Universal Medical Solutions coordinated with a third party to ship DME to Medicare beneficiaries and submitted claims to Medicare for payment.

15.   A "completed doctor's order" is a prescription signed by a doctor for orthotic devices including back, knee, shoulder and wrist braces.

16.   As a result of this kickback scheme, between August 31, 2017 and March 5, 2019, Universal Medical Solutions transferred approximately $967,472 in payments to Pantheon and Chronos.

17.   Also between March 26, 2017 and April 9, 2019, Universal Medical Solutions billed Medicare $49,450,994.63 for claims, which resulted in Medicare making payments of $22,295,085.67 to Universal Medical Solutions.

18.   The Medicare fraud scheme violates federal law in several respects: (1) the purchase of completed doctors' orders amounts to the payment of kickbacks in exchange for the referral of patients, in violation of federal anti-kickback statutes, and (2) the braces and DME supplied by the DME companies are largely medically unnecessary, and often unwanted and unused, constituting health care fraud on Medicare and other insurers.

//

//

---

of thousands of dollars or more from DME companies for doctors' orders and back-end services.  CHS-1 has pleaded guilty to one count of conspiracy in violation of 18 USC 371 pursuant to a plea agreement with another federal jurisdiction.  The plea agreement provides for a recommendation of probation from the government. CHS-1 agreed to pay at least $40,000,000 in restitution.

## THE MEDICARE PROGRAM

19.     Medicare is a federal health care benefit program that provides benefits to persons who are sixty-five years (65) years of age or older, or disabled. Medicare Part B is a medical insurance benefit that covers medically necessary physician office services, including the ordering of durable medical equipment (DME).

20.     Durable medical Equipment (DME) includes arm, leg, back, and neck braces. The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the definition of "braces" as "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or elimination motion in a diseased or injured part of the body." To qualify for payment by Medicare, a service or item must have been reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.

## TELEMEDICINE

21.     According to the Medicare Claims Processing Manual, Chapter 12, Section 190, coverage and payment for Medicare telehealth requires (a) that the beneficiary was located in a rural or health professional shortage area; (b) the services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth consultation.

22.     These Medicare regulations govern reimbursement by Medicare for telehealth consultation services. However, Medicare contractors have taken the position that the failure to comply with these requirements may undermine a showing of medical necessity when the telehealth consultation results in the ordering of DME—that is, that a telephone consultation may be insufficient to establish the need for an orthotic brace. For example, according to the Local Coverage Determination (LCD), in place nationally for services performed on or after October 1, 2015, knee braces require an examination of the patient. The LCD states that knee braces are medically necessary only where knee instability is documented by an in-person examination of the beneficiary and by object description of

5

joint laxity. Claims are expressly *not* reasonable and necessary if only pain or a subjective description of joint instability is documented. Back braces are covered only when they are ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine. Shoulder, wrist, and ankle braces must be medically necessary for diagnosis of or to treat an injury or illness.

## PROVIDER ENROLLMENT

23.    By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules and regulations issued by Centers for Medicare and Medicaid Services and its authorized agents and contractors.

## VI.    FACTS

### CHS-1 and CHRONOS and PANTHEON

24.    CHS-1 was the owner of two call center companies, Chronos Strategies HLK ("Chronos"), and Pantheon Concepts HLK ("Pantheon"), which were located in the Philippines.

25.    CHS-1 used his call centers, Chronos and Pantheon, to generate "leads" for various types of businesses and to offer business process outsourcing services for various types of businesses.

26.    A primary source of income for Chronos and Pantheon was through an illegal kickback and healthcare fraud scheme with DME companies operating in the United States.

27.    As part of the illegal kickback and health care fraud scheme, Chronos and Pantheon sold "completed doctors' orders" to DME companies.

//

28.     The illegal kickbacks Chronos and Pantheon received from the DME companies for "completed doctors' orders" was in violation of the Anti-Kickback statute under Title 42, United States Code, Sections 1320a-7b.   The Anti-Kickback statute provides that it is a felony for an entity to knowingly and willfully offer or pay any remuneration to induce a person to refer an individual for the furnishing of any item for which payment may be made under a Federal health care program.

29.     The illegal kickback and health care fraud scheme used advertisements through television commercials, online internet advertisements, and direct mailing targeting Medicare beneficiaries.

30.     These advertisements offered braces at little to no cost for individuals covered by Medicare. The advertisements provided individuals (and potential beneficiaries) with a toll-free call-in number.  If the individual called the number provided in the advertisement, the call would be routed to CHS-1's call center, Pantheon, located in the Philippines.

31.     The employee at Pantheon who initially answered the call was known as a "Fronter." The Fronter would collect the caller's information and confirm their Medicare eligibility.   Specifically, the Fronter would acquire the beneficiary's name and other identifiers, the type of pain and/or brace the caller-beneficiary was inquiring about, and the caller's Medicare ID number or other insurance information. While the beneficiary was still on the line, the Fronter would verify, through a third-party vendor, the beneficiary's health insurance information.

32.     The Fronter would also "brand" the call.  The "branding process" involved the use of an algorithm that would assign the caller beneficiary to a specific DME company. The algorithm was based on a number of factors, including but not limited to: location of the beneficiary, type of Medicare coverage (such as Medicare Advantage, etc.), type of brace, and the DME's escrow balance. The Fronter would then transfer the caller beneficiary to what was known as a "Chaser."

33.     The Chaser would then answer the call with the Beneficiary and represent that the Chaser was an employee of the "branded" DME company. For example, if the

beneficiary was branded for Universal Medical Solutions, LLC, the Chaser, a Pantheon employee, would answer the call and misrepresent that the Chaser was an employee of Universal Medical Solutions, LLC.

34.     The Chaser would use a script and attempt to "upsell" and induce the beneficiary into requesting additional braces as those braces would be covered by insurance.

35.     For example, CHS-1 schemed to "upsell" more braces to beneficiaries through what was known as the "Iron Man Kit." The "Iron Man Kit" consisted of two wrist braces, two arm/shoulder braces, two knee braces, and one back brace.

36.     CHS-1 eventually directed employees to stop "upselling" more than three braces per beneficiary in order to avoid scrutiny from Medicare.

37.     After determining the braces to be ordered, the Chaser would begin the process of obtaining a signed doctor's order for the brace or braces.

38.     To obtain the signed order, the Chaser would facilitate the completion of a doctor's order by working with the beneficiary's primary care physician or by connecting the beneficiary with a telemedicine doctor.

39.     Pantheon would encourage beneficiaries to use telemedicine doctors because telemedicine doctors tend to return signed doctor's orders more frequently than primary care physicians.  If the beneficiary insisted on using their primary care physician, the Chaser would end the call with the beneficiary and attempt to obtain a signed order from the primary care physician.

40.     If the primary care physician declined to sign the order proscribing the brace, the Chaser would call the beneficiary back and again attempt to have the beneficiary obtain a doctor's order for braces through a telemedicine doctor.

41.     If the beneficiary agreed to speak with a telemedicine doctor, the Chaser would, depending on the telemedicine company, either initiate a live transfer of the call to a telemedicine representative or end the call and pass the beneficiary's information to the telemedicine company.

## CHS-1 Conspires With BELL SR. And BELL JR.

42.   CHS-1 met BELL SR. at a trade show in or about 2015.

43.   At that time, CHS-1 was the owner of Pantheon and Chronos. BELL SR. and CHARLES BURRUSS were co-operators of a DME company, PA Healthcare.

44.   Starting in 2016, BELL SR. and BURRUSS consistently purchased completed doctors' orders from CHS-1.

45.   In 2016, BELL SR. and his son, BELL JR. opened a DME company, Universal Medical Solutions, LLC. BELL SR. and BELL JR. were the co-owners and operators of Universal Medical Solutions, LLC.

46.   CHS-1, via Chronos and Pantheon, agreed to terms with BELL SR. and BELL JR., via Universal Medical Solutions, and executed "Marketing" and "Business Process Outsourcing" ("BPO") agreements.

47.   These Marketing and BPO agreements did not reflect the actual per product pricing structure used by Chronos, Pantheon, and Universal Medical Solutions. The Marketing and BPO agreements were instead executed to "paper-over" and hide the illegal kickback arrangements.

48.   The actual pricing structure scheme operated as follows:

a.   Universal Medical Solutions would request a certain number of products for a specific time period. For example, Universal Medical Solutions may request 700 products per month.

b.   Universal Medical Solutions would then pay up-front with a deposit to Chronos and Pantheon for the total cost of those products. For this example, if Universal Medical Solutions ordered 700 products per month at a price of $280 per product then Universal Medical Solutions would pay a total of price of $196,000 (700 products x $280 per product = $196,000).

c.   This payment amount ($196,000 for example) from Universal Medical Solutions to Chronos and Pantheon would then be credited by Chronos/Pantheon in a type of escrow account.

49.   As Chronos and Pantheon received calls from potential beneficiaries, Medicare beneficiaries would be "branded" to Universal Medical Solutions (and other DME companies), based, in part, on the balance credited to the escrow account for payments made by Universal Medical Solutions to Chronos and Pantheon.

50.   If Chronos and Pantheon obtained a signed doctor's order, Chronos/Pantheon would deduct $280 from the escrow account for each product prescribed by the doctor's order. For example, if the doctor's order prescribed a knee and a neck brace, Universal Medical Solutions' escrow account would be charged $560 (2 products x $280 = $560).

51.   Once Universal Medical Solutions' deposits in the escrow account reached a certain level, Chronos and Pantheon would generate invoices to Universal Medical Solutions. The invoices did not reflect the $280 per product pricing structure. Instead, the invoices based the price as 75% to Marketing and 25% to Business Process Outsourcing (BPO) fees. These invoices were generated after the fact and do not accurately reflect the amount of Marketing or BPO services actually used to generate the product.

52.   The invoices were created in order to disguise the true nature of the relationship and agreement for Universal Medical Solutions to pay up front kickback fees to Chronos and Pathenon in exchange for completed doctor's orders that Universal Medical Solutions used to submit Medicaid claims and falsely representing that it was purchasing bona fide services.

53.   Universal Medical Solutions paid Chronos and Pantheon $280 per completed doctor's order ($280 "per product").

54.   Numerous Medicare beneficiaries received orthotics braces from Universal Medical Solutions 1 and 2. Numerous Medicare beneficiaries received orthotics braces through completed doctors' order despite not having been physically examined by the prescribing physician.

55.   If a doctor was consulted, the communication occurred over the telephone. Medicare Beneficiaries did not communicate with a doctor in person or via video

//

10

conference. Many beneficiaries did not even recognize the name of the doctor who supposedly proscribed their orthotics for a completed doctor's order.

56.    In the below examples and others, Medicare beneficiaries did not receive an examination from a doctor or even a video call from a doctor at a clinic. Rather, at most, the Medicare beneficiaries only communicated a subjective reporting of pain to doctors over the telephone. This practice is insufficient to establish "necessity" under Medicare rules and regulations.

57.    For example, <u>Medicare beneficiary R.S.</u> called a number that he saw on a television commercial advertising back braces. R.S. called the number and provided his contact information to the representative.  R.S. was told that a doctor would call back.  The next day R.S. received a call from a doctor—that R.S. did not know—who asked if R.S. had back problems. The doctor further told R.S. that R.S. was also eligible to receive a knee brace. R.S. declined the knee brace but did submit his Medicare information to the doctor for the back brace. Approximately three or four weeks later a back brace was delivered by mail to R.S.' residence. R.S. did not know whether the knee brace was shipped as well. R.S. tried the back brace but it did not alleviate his symptoms.

58.    Medicare claims data shows that on December 20, 2017, Universal Medical Solutions 1 submitted a claim in the amount of $3,793.28 for a back brace, left knee brace, and lower extremity left suspension sleeve for R.S. Medicare paid $1,492.65 to Universal Medical Solutions 1 for these items.

59.    In another example, <u>Medicare beneficiary D.J.</u> filled out an online questionnaire where D.J. disclosed that he had knee and back pain. After completing the survey D.J. began receiving telephone calls from a company. D.J. does not recall the name of the company.  During one of the telephone calls D.J. requested the largest back brace available. D.J. does not recall whether he spoke with a doctor during the call. D.J. received the back brace from Universal Medical Solutions.  The back brace did not fit D.J. so he called Universal Medical Solutions to request a new back brace in a different size. Universal Medical Solutions told D.J. to donate the back brace to church and that a new

1 │ back brace would be shipped to D.J. D.J. never received the new back brace. D.J.'s primary
2 │ physician has never prescribed medical braces for D.J.

3 │ 60. Medicare claims data shows that on August 29, 2018, Universal Medical
4 │ Solutions 2 submitted a claim in the amount of $5,071.23 for a back brace, right knee brace,
5 │ left knee brace and a left lower extremity suspension sleeve for D.J. Medicare paid
6 │ $2,414.33 to Universal Medical Solutions 2 for these items.

7 │ 61. In another example, Medicare beneficiary C.M. met an individual outside of
8 │ St. Vincent's Hospital in San Diego, who asked C.M. if he had a Medicare card and advised
9 │ C.M. that if he was a Medicare beneficiary that he could receive braces. C.M. stated that
10 │ he was interested in braces for his shoulder, back and right knee and gave the individual
11 │ his Medicare and Medi-Cal information. Soon thereafter C.M received two telephone calls
12 │ regarding the braces. One of the telephone calls was from a doctor who asked about C.M.'s
13 │ pain. The doctor did not examine C.M. C.M. later received a shipment via UPS of the
14 │ braces and a sleeve.

15 │ 62. Medicare claims data shows that on August 29, 2018, Universal Medical
16 │ Solutions 2 submitted a claim in the amount of $4,280.40 for a back brace, right knee brace,
17 │ left knee brace and a left lower extremity suspension sleeve for C.M. Medicare paid
18 │ $2,341.16 to Universal Medical Solutions 2 for these items.

19 │ 63. In a similar example, Medicare beneficiary M.N. was approached by an
20 │ individual outside of St. Vincent's Hospital in San Diego, who offered M.N. medical
21 │ braces. M.N told the individual that M.N. did not want to get involved with anything illegal.
22 │ M.N.'s provided his/her information to the individual and requested back, knee, and should
23 │ braces. M.N. later told his/her primary care doctor about the braces. M.N.'s primary care
24 │ doctor told M.N. that a back brace is the worst thing to treat M.N.'s scoliosis. M.N. never
25 │ received the braces he/she requested.

26 │ 64. Medicare claims data shows that on August 29, 2018, Universal Medical
27 │ Solutions 2 submitted a claim in the amount of $4,280.40 for a back brace, a right
28 │ //

suspension sleeve, a left knee brace, and a right shoulder brace for M.N. Medicare paid $2,341.16 to Universal Medical Solutions 2 for these items.

65.   In another example, <u>Medicare beneficiary C.M.M.</u> spoke on the telephone with an individual who told C.M.M. that a doctor would be getting on the call as well. C.M.M. told the doctor that he/she had back pain. After the call, C.M.M received boxes containing a variety of braces. C.M.M returned the variety of braces to the company and did not wear the back brace.

66.   Medicare claims data shows that on July 7, 2018, Universal Medical Solutions 1 submitted a claim in the amount of $3,703.43 for a back brace, right compression sleeve, right knee brace, and left knee brace for C.M.M. shoulder braces for C.M.M. Medicare paid $2,419.33 to Universal Medical Solutions 2 for these items.

67.   In another example, <u>Medicare beneficiary S.D.</u> saw a television commercial advertising braces for Medicare patients. S.D. called to inquire about the braces. S.D. later received a box of braces with a return shipping label address of Prospect Street, Santee, California. Neither of S.D.'s primary care physicians ordered any medical braces for S.D.

68.   Medicare claims data shows that on April 4, 2019, Universal Medical Solutions 2 submitted a claim in the amount of $3,478.55 for a back brace, right knee brace, right compression sleeve and a right shoulder/wrist brace for S.D. Medicare paid $2,395.03 to Universal Medical Solutions 2 for these items.

69.   In September 2018, the Centers for Medicare and Medicaid Services (CMS), partially suspended Universal Medical Solutions after a review of a sample of 40 claims for back braces, based upon a finding that Universal Medicare had billed Medicare for medically unnecessary orthotics devices.

70.   <u>Kickback Payment Figures</u>: As a result of this kickback scheme, between August 31, 2017 and March 5, 2019, bank accounts held in the name of Universal Medical Solutions transferred approximately $967,472.00 in payments to Pantheon and Chronos.

//

//

71.   <u>Claims Billed to Medicare</u>: According to Medicare data, between March 26, 2017 and April 9, 2019, Universal Medical Solutions LLC billed Federal Health Care Programs for claims for approximately $49,450,994.

72.   <u>Payments Received from Medicare</u>: According to Medicare data, between March 26, 2017 and April 9, 2019, Universal Medical Solutions LLC received payment of approximately $22,295,085.67 for these claims.

73.   Wells Fargo Bank account number ##0285 and Wells Fargo Bank account number ##0293 were two of the accounts used by Universal Medical Solutions to receive deposits of $22,295,085.67 from Federal Health Care Programs for claims.

**BELL SR. AND BELL JR. ALSO USED OTHER MARKETERS FOR DOCTORS' ORDERS**

74.   In addition to Pantheon and Chronos, between August 31, 2017 and April 4, 2019, BELL SR. and BELL JR., through Universal Medical Solutions, paid the below amounts to the following "marketers" who created, sold, and/or conveyed completed doctors' orders to DME companies in violation of federal anti-kickback laws and other federal law:[2]

| MARKETING COMPANY | PAYMENTS BY UNIVERSAL MEDICAL SOLUTIONS TO MARKETING COMPANIES |
|---|---|
| Chronos Strategies HLK | $672,000.00 |
| Pantheon Concepts HLK | $295,472.00 |
| Marketing Company #1 | $4,521,000.00 |
| Marketing Company #2 | $2,412,500.00 |
| Marketing Company #3 | $320,405.00 |
| Marketing Company #4 | $678,720.00 |

---

[2] Some of these marketing companies are currently under investigation, so their names are not disclosed here.

| Marketing Company #5 | $50,000.00 |
| Marketing Company #6 | $1,200,000.00 |
| Marketing Company #7 | $1,254,100.00 |
| Marketing Company #8 | $100,000.00 |
| Marketing Company #9 | $56,250.00 |
| Marketing Company #10 | $166,000.00 |

75.     Altogether, Universal Medical Solutions made payments of approximately $11,726,447 to the above marketing companies. Wells Fargo Bank account number ##0285 and Wells Fargo Bank account number ## 0293 were two of the accounts used by Universal Medical Solutions to make these payments.

**WELLS FARGO BANK ACCOUNT NUMBER ##0293**

76.     Defendant is $269,952.56 in U.S. currency seized from Wells Fargo Bank account number ##0293 on May 15, 2019 pursuant to a seizure warrant signed by the Honorable Michael S. Berg.

77.     Wells Fargo Bank account number ##0293 was held in the name of Universal Medical Solutions, LLC. The signers on the account are BELL SR. AND BELL JR.

78.     The funds deposited into Wells Fargo Bank account number ##0293 predominantly originate from Medicare.

79.     Between November 14, 2018 and November 14, 2019, Medicare deposited over $536,422.59 into Wells Fargo Bank account number ##0293.

80.     Wells Fargo Bank account number ##0293 was utilized to facilitate promotional money laundering.  Approximately $2,586,800 of proceeds deposited into the account were used to further the fraud, through the purchase of completed doctors' orders from five marketing companies.

//

//

//

## WELLS FARGO BANK ACCOUNT NUMBER ##0285

81.    Defendant is $536,422.59 in U.S. currency seized from Wells Fargo Bank account number ##0285 on April 8, 2019 pursuant to a seizure warrant signed by the Honorable Andrew G. Schopler.

82.    Wells Fargo Bank account number ##0285 was held in the name of Universal Medical Solutions, LLC. The signers on the account are BELL SR. and BELL JR.

83.    The funds deposited into Wells Fargo Bank account number ##0285 predominantly originate from Medicare.

84.    Between November 14, 2018 and November 14, 2019, Medicare deposited over $536,422.59 into Wells Fargo Bank account number ##0285.

85.    Wells Fargo Bank account number ##0285 was utilized to facilitate promotional money laundering.  Approximately $3,110,000 of proceeds deposited into the account were used to further the fraud though the purchase of completed doctors' orders from five marketing companies.

## REAL PROPERTY PURCHASED WITH FORFEITABLE PROCEEDS

86.    The Defendant Real Property located at 5034 Bluff Place, El Cajon, California 92020, is owned by BELL SR. and Tamara Sherra Bell.

87.    The Defendant Real Property was purchased with funds from Wells Fargo Bank account number ending in ##0335. Wells Fargo Bank account number ##0335 was held in the name of Pharmafind Inc. The sole signer on the account was BELL SR.

88.    The funds deposited into Wells Fargo Bank account number ##0335 predominantly originate from funds transfers made from Medicare to other DME companies associated with Bell SR. and Bell JR.

89.    On January 24, 2019, $72,000 was wired from Wells Fargo Bank account number ##0335 to Great Pacific Escrow for the purchase of the Defendant Real Property.

90.    On March 5, 2019, $477,531 was wired from Wells Fargo Bank account number ##0335 to Great Pacific Escrow for the purchase of the Defendant Real Property.

//

91.     The total amount of funds wired on January 4, 2019 and March 5, 2019 from Wells Fargo Bank account number ##0335 to Great Pacific Escrow for the purchase of the Defendant Real Property was $549,531.

92.     <u>Funds from Wells Fargo Bank account number ##0293</u>: Between the date of the ##0335 account opening on September 13, 2018 and March 5, 2019, Wells Fargo Bank account number ##0293 (referenced in paragraphs above) deposited approximately $718,750.00 into Wells Fargo Bank account number ##0335.

93.     <u>Funds from Wells Fargo Bank account number ##0285</u>: Between the date of the ##0335 account opening on September 13, 2018 and March 5, 2019, Wells Fargo Bank account number ##0285 (referenced in paragraphs above) deposited approximately $400,000.00 into Wells Fargo Bank account number ##0335.

94.     <u>Total funds from Wells Fargo Bank Account number ##0293 and ##0285</u>: Between the date of the ##0335 account opening on September 13, 2018 and March 5, 2019, Wells Fargo Bank account number ##0293 and Wells Fargo Bank account number ##0285 deposited approximately $1,118,750.00 into Wells Fargo Bank account number ##0335.

95.     <u>Funds from Universal Medical Solutions</u>: Between the date of the ##0335 account opening on September 13, 2018 and March 5, 2019, Universal Medical Solutions deposited approximately $15,609.70 into Wells Fargo Bank account number ##0335.

96.     <u>Funds from PA Healthcare</u>: Between the date of the ##0335 account opening on September 13, 2018 and March 5, 2019, PA Healthcare deposited approximately $186,000 into Wells Fargo Bank account number ##0335. PA Healthcare was a DME company co-operated by BURRUSS and BELL SR.

97.     <u>Funds from Crown Medical</u>: Between the date of the ##0335 account opening on September 13, 2018 and March 5, 2019, Crown Medical deposited approximately $20,000 into Wells Fargo Bank account number ##0335. Crown Medical was a San Diego DME company owned by Michelle King and operated by Michelle King and her husband Philanzo King. FBI Agents know the Kings to be friends of BELL SR.

98.    <u>Funds from PharmaFind</u>: Between the date of the ##0335 account opening on September 13, 2018 and March 5, 2019, PharmaFind deposited over $86,600 into Wells Fargo Bank account number ##0335. According to California Secretary of State records, PharmaFind was a Marketing And Management company owned by BELL SR.  The funds received by this PharmaFind account primarily originate from other DME accounts tainted by the healthcare fraud.

## VI.    <u>CLAIM FOR RELIEF</u>

### COUNT 1

**Defendant $267,422.59 in U.S. Currency Seized From Wells Fargo Bank Acct. #0293**

99.    The United States incorporates by reference the allegations in paragraphs one (1) through ninety-eight (98) above as though fully set forth herein.

100.    The Defendant is $267,422.59 in U.S. currency seized from Wells Fargo Bank account number ending in ##0293 is property that constitutes or is derived from proceeds traceable to the below violations and is therefore, subject to forfeiture to the United States in accordance with Title 18, United States Code, Section (a)(1)(C) and Title 18, United States Code, Section 981(a)(1)(A).

101.    The Defendant constitutes forfeitable proceeds under Title 18, United States Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or are derived, from proceeds traceable to Defendants' violations of Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire/Mail Fraud and Health Care Fraud); and (Conspiracy to Commit Wire Fraud and Health Care Fraud); and Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 42, United States Code, Section 1320-7b(b)(2)(A) (Anti-Kickback Statute); and Title 18, United States Code, Section 1956 (Laundering Monetary Instruments); and Title 18, United States Code, Section 1957 (Transacting in Criminal Proceeds); or any violation of any offense constituting a "specified unlawful activity" as defined in Title 18, United States Code, Section 1956(c)(7), or a conspiracy to commit such offense.

//

102.   The Defendant is also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A) as any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or Title 18, United States Code, Section 1957.

## COUNT 2

**Defendant $536,422.59 in U.S. Currency Seized From Wells Fargo Bank Acct. #0285**

103.   The United States incorporates by reference the allegations in paragraphs one (1) through ninety-eight (98) above as though fully set forth herein.

104.   The Defendant is $536,422.59 in U.S. currency seized from Wells Fargo Bank account number ending in ##0285 is property that constitutes or is derived from proceeds traceable to the below violations and is therefore, subject to forfeiture to the United States in accordance with Title 18, United States Code, Section (a)(1)(C) and Title 18, United States Code, Section 981(a)(1)(A).

105.   The Defendant constitutes forfeitable proceeds under Title 18, United States Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or are derived, from proceeds traceable to Defendants' violations of Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire/Mail Fraud and Health Care Fraud); and Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 42, United States Code, Section 1320-7b(b)(2)(A) (Anti-Kickback Statute); and Title 18, United States Code, Section 1956 (Laundering Monetary Instruments); and Title 18, United States Code, Section 1957 (Transacting in Criminal Proceeds); or any violation of any offense constituting a "specified unlawful activity" as defined in Title 18, United States Code, Section 1956(c)(7), or a conspiracy to commit such offense.

106.   The Defendant is also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A) as any property, real or personal, involved in a transaction or attempted transaction for Defendants' violations of Title 18, United States Code, Section 1956 and Title 18, United States Code, Section 1957.

//

## COUNT 3

### Defendant Real Property Located at 5034 Bluff Pl, El Cajon, CA 92020

107.   The United States incorporates by reference the allegations in paragraphs one (1) through ninety-eight (98) above as though fully set forth herein.

108.   The Defendant Real Property is located at 5034 Bluff Pl El Cajon, CA 92020, more particularly described as:

APN: 493-400-57-00

PARCEL A:

PARCEL 4 OF PARCEL MAP NO. 1155, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, DECEMBER 14, 1972, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, BEING A PORTION OF TRACT "A" OF RANCHO EL CAJON, AND BEING IN SECTION 14, TOWNSHIP 16 SOUTH, RANGE 1 WEST, SAN BERNARDINO MERIDIAN.

PARCEL B:

AN EASEMENT AND RIGHT OF WAY FOR GENERAL ROAD PURPOSES OVER THE SOUTH 20 FEET OF THE FOLLOWING DESCRIBED LAND:

THAT PORTION OF LOT "A" OF THE RANCHO EL CAJON, BEING ALSO A PORTION OF SECTION 14, TOWNSHIP 16 SOUTH, RANGE 1 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTH LINE OF SAID SECTION 14, DISTANT THEREON SOUTH 89° 17' EAST, 653 FEET FROM THE QUARTER CORNER OF THAT SAID SOUTH LINE OF SAID SECTION 14; THENCE SOUTH 89° 17' EAST ALONG THE SAID SOUTH LINE OF SAID SECTION 14,210 FEET; THENCE NORTH 0° 06' WEST PARALLEL WITH THAT LINE OF THE SOUTHEAST QUARTER OF SAID SECTION 14, 550 FEET TO THE SOUTHEAST CORNER OF THE LAND CONVEYED TO ROBERT LIVESEY AND LETHA M. LIVESEY, BY DEED DATED MARCH 1, 1927, RECORDED IN BOOK 1340, PAGE 124 OF DEEDS, RECORDS OF SAN DIEGO COUNTY; THENCE NORTH

20

89° 17' WEST ALONG THE SOUTH LINE OF THE LAND SO CONVEYED TO SAID LIVESEY, 210 FEET TO THE SOUTHWEST COMER OF SAID LIVESEYS' LAND; THENCE SOUTH 0° 06' EAST, 550 FEET TO THE POINT OF BEGINNING.

PARCEL C:

AN EASEMENT AND RIGHT OF WAY FOR INGRESS AND EGRESS OVER THE WEST 30 FEET OF LOT 35 OF HORIZON HILLS ESTATES UNIT NO. 1, IN THE COUNTY OF SAN DIEGO STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 3658, FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, JUNE 5, 1957.

109.   The Defendant Real Property is property that constitutes or is derived from proceeds traceable to the below violations and is therefore, subject to forfeiture to the United States in accordance with Title 18, United States Code, Section (a)(1)(C) and Title 18, United States Code, Section 981(a)(1)(A).

110.   The Defendant Real Property constitutes forfeitable proceeds under Title 18, United States Code, Section 981(a)(1)(C), as any property, real or personal, which constitutes or are derived, from proceeds traceable to Defendants' violations of Title 18, United States Code, Section 1349 (Conspiracy to Commit Wire/Mail Fraud and Health Care Fraud); and Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 42, United States Code, Section 1320-7b(b)(2)(A) (Anti-Kickback Statute); and Title 18, United States Code, Section 1956 (Laundering Monetary Instruments); and Title 18, United States Code, Section 1957 (Transacting in Criminal Proceeds); or any violation of any offense constituting a "specified unlawful activity" as defined in Title 18, United States Code, Section 1956(c)(7), or a conspiracy to commit such offense.

111.   The Defendant Real Property is also subject to forfeiture under Title 18, United States Code, Section 981(a)(1)(A) as any property, real or personal, involved in a transaction or attempted transaction for Defendants' violations of Title 18, United States Code, Section 1956 and Title 18, United States Code, Section 1957.

//

112.   The Defendant Real Property was purchased on January 31, 2019, with forfeitable fraud proceeds and involved in money laundering transactions.

113.   The Defendant Real Property is owned by ANTHONY DUANE BELL SR. and TAMARA SHERRA BELL, husband and wife, as joint tenants. The Defendant Real Property has not been seized but is located within the jurisdiction of the Court. The United States does not request authority from the Court to seize the Defendant Real Property at this time. The United States will, as provided by Title 18, United States code, Section 985(b)(1) and (c)(1), and Supplemental Rule G(4):

a.   post notice of this action and a copy of the Complaint on the Defendant Real property; and

b.   serve notice of this action on the Defendant Real Property owner(s), and any other person or entity who may claim an interest in the Defendant Real Property, along with a copy of this Complaint; and

c.   file a *lis pendens* in county records of the Defendant Real Property's status as a Defendant in this *in rem* action; and

d.   publish notice of action as required by statute and applicable rules.

**WHEREFORE**, the United States prays that due process issue to enforce the forfeiture of the Defendants and that due notice be given to all interested parties to appear and show cause why said forfeiture should not be declared, that the Defendants be condemned as forfeited to the United States to be disposed of according to law, and for such other relief as this Court may deem just and proper.

DATED:      November 13, 2019                    Respectfully submitted,

ROBERT S. BREWER, JR.
United States Attorney

*s/David J. Rawls*
DAVID J. RAWLS
Assistant United States Attorney
Attorneys for the United States

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America

**(b)** County of Residence of First Listed Plaintiff

(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

AUSA David J. Rawls, Phone: (619) 546-7966
USAO, 880 Front Street, Room 6293, San Diego, CA 92101-8893

## DEFENDANTS

$269,952.56 from Wells Fargo Bank Account Number ##0293, et al.

County of Residence of First Listed Defendant

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

'19 CV 2171 BEN MDD

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☒ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
18 U.S.C. Section 981(a)(1)(C)

Brief description of cause:
Health Care Fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 11/13/2019

SIGNATURE OF ATTORNEY OF RECORD
s/ David J. Rawls

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**VERIFICATION**

I, Melissa Plowman, state and declare as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation, and am one of the federal law enforcement officers involved in this investigation.

2.     I have read the foregoing Complaint For Forfeiture and know its contents.

3.     The facts set forth in the Complaint For Forfeiture are based upon my own knowledge or were facts furnished to me by other United States federal, state, or local law enforcement personnel, civilian witnesses, or other official Government sources.

Based on this information, I believe the allegations in the Complaint For Forfeiture to be true.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on November ____, 2019.


MELISSA PLOWMAN, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION